Exhibit 11

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15223
_____

D.C. Docket No. 0:16-cr-60350-WPD-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JERMAYNE WHYTE,
a.k.a. Turtle,
JENNIFER CASTRO,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 10, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

The main issue presented by this appeal is whether the government may prove sex trafficking of a minor, 18 U.S.C. § 1591, by establishing only that a defendant had a reasonable opportunity to observe the minor victim instead of proving that he knew or recklessly disregarded the victim's age. Jermayne Whyte and Jennifer Castro appeal their convictions and sentences for the sex trafficking of a minor, *id.*; conspiracy to commit sex trafficking of a minor, *id.* §§ 1591(a)(1), (b)(2), 1594(c); and knowingly transporting an individual in interstate commerce for the purpose of engaging in prostitution, *id.* § 2421(a). After A.E., a 16-year-old runaway from California, arrived in Florida, she met Whyte and Castro and lived with them for about two months during which Whyte and Castro obtained work for A.E. at strip clubs and facilitated her prostitution. Notwithstanding our earlier dicta to the contrary in *United States v. Mozie*, 752 F.3d 1271, 1282 (11th Cir. 2014), we conclude that the 2015 amendment of section 1591 makes clear that the government may satisfy its burden by proving that the defendant had a reasonable opportunity to observe the minor victim. We also conclude that Whyte and Castro's challenges of the jury instructions, the denial of their motion to suppress evidence, a limitation on Castro's cross-examination of A.E., and their sentences all fail. We affirm.

# I. BACKGROUND

When A.E. was 16 years old, she ran away from her family in California. A.E. had been spending time with people her father considered "thugs," including a man named Marcus Weber. Weber, whom A.E. later described as a "dangerous guy" she could not refuse, coerced A.E. to board a flight to Florida. When A.E. left, she was on probation and could have been punished with up to 15 years of imprisonment for leaving California.

After A.E. arrived in Florida, she began working for an escort agency. The agency posted advertisements for A.E. on Backpage.com, a website that could be used to obtain prostitutes. A.E. began going on what she described as "dates" or engagements in which men paid to have sex with her. During this period, A.E. used several false identities.

Shortly after her arrival in Florida, A.E. received unprompted text messages from Jennifer Castro, an adult prostitute who also worked at strip clubs. Castro told A.E. that she "could put [A.E.] in a better situation." After texting with Castro for two days, A.E. agreed to meet her. When they met in person, Castro came with her partner, Jermayne Whyte, nicknamed "Turtle," and their baby. Whyte and Castro brought A.E. home with them. A.E. lived with Whyte and Castro in their townhouse for most of a two-month period. A.E. slept on the couch, and Whyte

and Castro slept in the master bedroom. Whyte and Castro bought A.E. food and clothing. They also gave A.E. marijuana and smoked it with her.

For the first few days, A.E. enjoyed living with Whyte and Castro and performed no work. But then Whyte and Castro encouraged A.E. to work at a strip club. A.E. explained that she had no identification document, but Whyte and Castro obtained a false identification for her. The identification was in the name of "Jessica Berry," who was about 24 or 25 years old. A.E. used this false identification to work at multiple strip clubs. Whyte and Castro drove A.E. to the strip clubs to perform that work.

Whyte and Castro also began prostituting A.E. They both posted ads for A.E. on Backpage.com. They chose the content of the ads and set the price for A.E.'s services. Along with the online ads, Whyte and Castro told A.E. to pick up clients at the strip clubs. And they took her to a nearby Hard Rock Casino to look for clients.

Whyte and Castro managed A.E.'s prostitution. They had a "trick phone" to communicate with A.E.'s "tricks"—i.e., the men who were paying to have sex with her. Whyte pretended to be A.E. in text conversations with her clients because A.E. "didn't know how to talk to them." Whyte and Castro instructed A.E. on how to treat clients, told her to use condoms, and taught her how to identify undercover police officers. A.E. did not know how to do her makeup, so someone else had to

do it for her. A.E. had no control over the money she made. Whyte would drive A.E. to her engagements, wait for her, and then collect the money. Castro also accompanied A.E. and was sometimes present in the same room as A.E. when she was having sex with a client. When she was working for Whyte and Castro, A.E. saw four to six clients a day.

After a few weeks of working for Whyte and Castro, they took a trip to Atlanta so that A.E. could work in more lucrative strip clubs there. Whyte drove A.E. in a rental car and arranged for A.E. to have sex with a client on their way. Whyte also had sex with A.E. on the trip. When he got tired, Whyte asked A.E. to drive, but she did not know how to drive and hit a traffic cone. Whyte later acknowledged that he needed to teach A.E. how to drive. Castro flew to Atlanta to meet Whyte and A.E., and the three of them stayed in a single hotel room. Whyte and Castro posted Backpage.com ads for A.E. and had her work at two strip clubs. But one strip club would not allow A.E. to work there because her appearance did not match the photograph for her identification and she "look[ed] young."

A.E. left Whyte and Castro a few times. After the Atlanta trip, A.E. left them when Whyte was arrested on an unrelated charge of providing a false identification. A.E. had several conversations with Whyte while he was in jail, which were recorded. Whyte encouraged A.E. to go back to Castro and called them a "family." Castro texted A.E. that she was "not here to play kiddie feelings games

with [A.E.]" and rebuked A.E. for being "too scared to deal with problems like a grown person." While Whyte was in jail, Castro maintained the trick phone, and she continued to post A.E. on Backpage.com. Castro refused to return A.E.'s medication and belongings to her. After Whyte was released, A.E. returned to living with Whyte and Castro and working at strip clubs. At one point, A.E. placed a call to a human-trafficking rescue hotline but did not report Whyte and Castro.

Meanwhile, Agent Roy Van Brunt of the Federal Bureau of Investigation received a lead about a runaway minor working as a prostitute at a strip club. When A.E. was working at a strip club one night, the police took her into custody. A.E. first admitted but then denied her true identity. A.E. told the police about her Backpage.com ads under the name "Cali Rose" or "Cali Rosebud," which the police used to locate the account that posted the ads and the phone numbers associated with it. After several weeks of being uncooperative, A.E. admitted her identity to Agent Van Brunt and Detective Nicholas Masters of the Broward County Sheriff's Office, and she told them about Whyte and Castro's role in her prostitution. After A.E. began cooperating with the police, a California court held a hearing to revoke her probation, but the court found that A.E. had not violated her probation.

Based on A.E.'s interview, Detective Masters obtained a search warrant for Whyte and Castro's townhome. Although he knew A.E.'s criminal history,

Detective Masters did not include it in his affidavit because he did not think it was relevant. When the police executed the warrant, they found several items that A.E. had described, including two duffel bags containing clothes A.E. had worn while stripping; a drug prescription for "Jessica Berry," the name on A.E.'s false identification; a rental car receipt for the Atlanta trip; and the trick phone.

The police also corroborated A.E.'s story by obtaining phone records that included A.E.'s text messages with Whyte and Castro. The police matched the trick phone with several Backpage.com ads posted for A.E. And the historical cell site data from the trick phone revealed that it had moved from Whyte and Castro's townhome to Atlanta and near several strip clubs, as A.E. had described. When the police interviewed Castro, she described A.E. as "very immature" and stated that she "had questions about her age from almost the first time she met her." Castro also "believed A.E. might be lying about how old she was."

In a superseding indictment, a grand jury indicted Whyte and Castro with conspiracy to commit sex trafficking of a minor, 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), 1594(c); sex trafficking of a minor, *id.* §§ 1591(a)(1), (b)(2), (c); and knowingly transporting A.E. from Florida to Georgia with the intent that A.E. engage in prostitution, *id.* § 2421(a).

Before trial, Whyte and Castro moved to suppress the evidence obtained pursuant to the search warrant. They argued that Detective Masters's affidavit

supporting the warrant omitted A.E.'s criminal history, which affected the

probable-cause determination. After conducting an evidentiary hearing about the

warrant, *see Franks v. Delaware*, 438 U.S. 154 (1978), the district court denied the

motion. The district court found Detective Masters "extremely credible" and "not

deliberate or reckless in omitting information in the affidavit." And the district

court ruled that he "acted in objective good faith when applying for and executing

the search warrant."

The government proceeded to trial on the theory that Whyte and Castro were

guilty of sex trafficking of a minor because they had a "reasonable opportunity to

observe" A.E., *see* 18 U.S.C. § 1591(c). The government argued that, although

section 1591(a) requires proof that a defendant knew or recklessly disregarded that

the victim had not attained the age of 18, section 1591(c) provides that the

government "need not prove that the defendant knew, or reckless disregarded" the

victim's age when it proves that "the defendant had a reasonable opportunity to

observe the [victim]." *Id.* Whyte and Castro contended that the government needed

to prove that they knew or recklessly disregarded A.E.'s age and so a mistake-of-

age defense would preclude their convictions. On the second day of trial, the

district court agreed with the government that it needed to prove only that Whyte

and Castro had a reasonable opportunity to observe A.E. and need not prove that

they knew or recklessly disregarded her age. In the light of this ruling, the court concluded that mistake of age was not a defense.

The government presented testimony from A.E., her father, Detective Masters, Agent Van Brunt, and other police officers who investigated the crimes. The government also presented the recorded jailhouse phone calls between Whyte, Castro, and A.E. And the government presented the phone records and historical cell site data from the trick phone. Whyte and Castro presented a defense about A.E. looking and acting like an adult, her willingness to engage in prostitution, and her criminal history.

The government also presented evidence about A.E.'s travel from California to Florida and the possible probation consequences for her. A.E. testified that Weber coerced her to board the flight to Florida. And the government later elicited testimony that A.E. informed the California court in her probation hearing that she had not left voluntarily and that the court found A.E. had not violated her probation. Castro sought to cross-examine A.E. about whether she lied in her probation hearing about leaving California involuntarily. The government objected, and the district court sustained on relevance grounds. Castro later cross-examined A.E. about the possible "15-year prison sentence hanging over [her] head." And Castro asked A.E., "Isn't it true that the only reason you're here testifying is so that you don't get violated on your probation?"

After closing argument, the district court instructed the jury that it could find Whyte and Castro guilty of sex trafficking of a minor and conspiracy to commit sex trafficking of a minor if it found that the defendants had a "reasonable opportunity to observe" the minor victim A.E. For the conspiracy charge, the district court instructed that the second element of a conspiracy is "[t]hat the Defendant knew the unlawful purpose of the plan and willfully joined in it." It defined the term "willfully" as "mean[ing] that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law." For the sex trafficking charge, the district court instructed that "[i]t is a federal crime for anyone . . . to recruit, entice, harbor, transport, provide, obtain or maintain by any means, a person, knowing or in reckless disregard of the fact that the person . . . would be caused to engage in a commercial sex act." The court then listed facts that the jury must find, but that list did not include "that the person . . . would be caused to engage in a commercial sex act" as an element. The jury found Whyte and Castro guilty of all charges.

A probation officer prepared presentence investigation reports for Whyte and Castro. The probation officer calculated Whyte's and Castro's base offense levels as 30. *See* United States Sentencing Guidelines Manual § 2G1.3(a)(2) (Nov. 2016). The probation officer then applied three two-level enhancements for unduly influencing a minor to engage in prohibited sexual conduct, *id.* § 2G1.3(b)(2)(b);

10

using a computer to offer prohibited sexual conduct with a minor, *id.* §

2G1.3(b)(3)(B); and for an offense involving the commission of a commercial sex

act, *id.* § 2G1.3(b)(4)(A). The reports did not include a two-level reduction for

acceptance of responsibility. With the enhancements, Whyte and Castro had total

offense levels of 36. Whyte's prior convictions yielded 11 criminal-history points.

The probation officer also included two more points because Whyte committed the

offenses while on probation. With a criminal history category of VI and an offense

level of 36, the probation officer calculated Whyte's guideline range as 324 to 405

months' imprisonment. Castro had six criminal-history points. With a criminal

history category of III and an offense level of 36, the probation officer calculated

Castro's guideline range as 235 to 293 months' imprisonment.

Whyte and Castro raised several objections to their guideline calculations.

They objected to the enhancement for undue influence of a minor. Whyte and

Castro argued that a two-point reduction for acceptance of responsibility was

warranted because, although they went to trial, they contested only whether a

"reasonable opportunity to observe" A.E. was sufficient for their convictions.

Whyte and Castro objected to the enhancement for the commission of a

commercial sex act as double counting because the base offense level already

accounted for the commission of a commercial sex act. And Castro objected to the

enhancement for use of a computer on the ground that application note 4 required

her to use a computer to communicate directly with A.E. but that she had used a computer only to communicate with A.E.'s clients.

At their joint sentencing hearing, the district court denied the requested reductions for acceptance of responsibility. The district court explained that, although the reduction may be applied on "rare occasion[s]" when a defendant goes to trial, it could not apply to Whyte and Castro because they disputed their guilt and did not fully accept responsibility. The district court sustained Castro's objection to the enhancement for undue influence but applied it to Whyte. The district court denied Castro's objection to the use-of-a-computer enhancement under section 2G1.3(b)(3)(B) based on *United States v. Hill*, 783 F.3d 842, 846 (11th Cir. 2015), which held that application note 4 does not apply to the enhancement under that subsection. The district court also denied their objection that the commercial-sex-act enhancement amounted to double counting. The district court then calculated Whyte's guideline range as 324 to 405 months, consistent with the presentence investigation report. Without the undue-influence enhancement, the district court reduced Castro's offense level to 34 and calculated her guideline range as 188 to 235 months.

After considering the statutory sentencing factors, 18 U.S.C. § 3553(a), the district court sentenced Whyte to 300 months of imprisonment. It ruled that "the fact that the government can't prove that Mr. Whyte knew that A.E. was a minor is

a mitigating circumstance." It also ruled that Whyte's criminal-history category of VI with only 13 points "overrepresented" his criminal history, so the court treated Whyte as if he was in category V with a guideline range of 292 to 365 months. The district court explained that it had sentenced similar defendants to life in prison for similar section 1591 offenses, so no significant disparity would occur from a 300-month sentence. The district court also considered Whyte's family support as a mitigating circumstance. After explaining that "it's important to impose a sentence that promotes respect for the law, that acts as a deterrent so that other individuals don't just blindly go along and pimp young girls," the district court "weigh[ed] the aggravating and mitigating circumstances" to find "that a sentence near the low end of the guideline range is appropriate," and it imposed a sentence near the bottom of Whyte's range as adjusted for the lower criminal-history category.

The district court sentenced Castro to 188 months of imprisonment after again considering the statutory sentencing factors. It reiterated that the failure of the government to prove that Castro knew A.E.'s age qualified as a mitigating circumstance. The district court explained that it had "imposed sentences on similar situations way over ten years in prison." It "weigh[ed] the aggravating and mitigating circumstances" in favor of "a sentence at the low end of the guideline range" and imposed the lowest sentence within that range.

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal. We review the legal

interpretation of a criminal statute *de novo*, *United States v. Williams*, 790 F.3d

1240, 1244 (11th Cir. 2015), including whether it is unconstitutionally vague,

*United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010). When a party

failed to object to a jury instruction at trial, we review for plain error. *United States*

*v. Felts*, 579 F.3d 1341, 1343 (11th Cir. 2009). We review a denial of a motion to

suppress under a mixed standard of review; we review factual findings for clear

error, construing the evidence in the light most favorable to the government, and

legal conclusions *de novo*. *United States v. Burgest*, 519 F.3d 1307, 1309 (11th Cir.

2008). We review a limitation on cross-examination for abuse of discretion. *United*

*States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017). We review the interpretation

of the Sentencing Guidelines *de novo* and any underlying factual findings for clear

error. *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). We review

whether the district court imposed a substantively reasonable sentence for abuse of

discretion. *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2007) (en banc).

## III. DISCUSSION

We divide our discussion in five parts. First, we explain that section 1591

permitted the government to convict Whyte and Castro by proving that they had a

reasonable opportunity to observe A.E. instead of by proving that they either knew

or recklessly disregarded A.E.'s age. Second, we explain that the district court committed no plain error in its jury instructions. Third, we explain that the district court did not err when it denied Whyte and Castro's motion to suppress because they failed to establish that Detective Masters omitted A.E.'s criminal history deliberately or with a reckless disregard for its materiality. Fourth, we reject Castro's argument that the limitation on her cross-examination of A.E. violated her confrontation right. Fifth, we explain that the district court correctly calculated Whyte's and Castro's guideline ranges and imposed substantively reasonable sentences.

### A.  *Section 1591 Permits the Government to Prove Only that Whyte and Castro had a "Reasonable Opportunity to Observe" A.E.*

Whyte and Castro challenge their convictions for sex trafficking of a minor on the ground that the district court misinterpreted section 1591 as permitting the government to prove only that they had a "reasonable opportunity to observe" A.E. They contend that section 1591 requires proof that they either knew or recklessly regarded A.E.'s age. Whyte and Castro contend that this misinterpretation led to a deficient indictment, erroneous jury instructions, and the erroneous preclusion of their mistake-of-age defense. Castro also argues that a "reasonable opportunity to observe" standard is unconstitutionally vague. These arguments fail.

Section 1591(a)(1) defines the following offense: "Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises,

maintains, patronizes, or solicits by any means a person . . . *knowing, or, . . . in*
*reckless disregard of the fact . . . that the person has not attained the age of 18*
*years* and will be caused to engage in a commercial sex act, shall be
punished . . . ." 18 U.S.C. § 1591(a)(1) (effective language since May 29, 2015)
(emphasis added). So under subsection (a)(1), the government must prove a
defendant's *mens rea* as to the victim's age by presenting evidence either that "the
defendant knew the child victim was a minor, *or* . . . the defendant recklessly
disregarded the fact that the child victim was a minor." *United States v. Duong*,
848 F.3d 928, 933 (10th Cir. 2017). But subsection (c) provides an exception: "In a
prosecution under subsection (a)(1) in which the defendant had a reasonable
opportunity to observe the [victim], the Government need not prove that the
defendant knew, or recklessly disregarded the fact, that the person had not attained
the age of 18 years." 18 U.S.C. § 1591(c).

Whyte and Castro argue that the government must always prove either actual
knowledge or reckless disregard of the victim's age, which it failed to charge and
prove for them, but the plain language of subsection (c) forecloses that
interpretation. Framed as what the government "need not prove," subsection (c)
relieves the government of its burden under subsection (a)(1) to prove knowledge
or reckless disregard of the victim's age so long as it proves that the defendant had
a reasonable opportunity to observe the victim. *Id.* That is, subsection (c) means

"that the government may prove that the defendant had a reasonable opportunity to view the victim *in lieu of* proving knowledge" or reckless disregard. *United States v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012). This interpretation "gives force to the provision's obvious goal—to reduce the government's burden where the defendant had a reasonable opportunity to observe the victim." *Id.* at 32; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* § 2, at 56 (2012) (explaining that "words are given meaning by their context," which includes the provision's purpose as "derived from the text"). Subsection (c) "supplies an *alternative* to proving any *mens rea* with regard to the defendant's awareness of the victim's age." *Robinson*, 702 F.3d at 32.

Whyte and Castro's interpretation violates the surplusage canon. It is a "cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted); *see also* Scalia & Garner, *Reading Law* § 26, at 174. Under Whyte and Castro's interpretation, subsection (c) "merely provides a way of proving [the] knowledge" required by subsection (a) of actual knowledge or reckless disregard. But that interpretation drains subsection (c) of all independent effect: If proof of a reasonable opportunity to observe the victim offers only a way of proving actual knowledge or reckless disregard of the victim's age, then no

effect can be given to the phrase "the Government need not prove." 18 U.S.C.

§ 1591(c).

Whyte and Castro invoke the rule of lenity, which requires that persistent ambiguity in criminal statutes be resolved in favor of the accused, but that rule has no application when a statute is unambiguous. *United States v. Jeter*, 329 F.3d 1229, 1230 (11th Cir. 2003); *see also* Scalia & Garner, *Reading Law* § 49, at 301 ("[T]he rule of lenity has no application when the statute is clear."). Section 1591(c) unambiguously provides that proof of a defendant's reasonable opportunity to observe the victim relieves the government of proving the *mens rea* described in subsection (a).

Whyte and Castro rely on dictum in our caselaw interpreting an earlier version of section 1591 that Congress has since abrogated. Before 2015, subsection (c) described evidence of a defendant's "reasonable opportunity to observe" a minor victim as a substitute for proof of what "the defendant knew" about the victim's age. *See* 18 U.S.C. § 1591(c) (effective language Dec. 23, 2008, to May 28, 2015) (When "a defendant had a reasonable opportunity to observe the [victim], the Government need not prove that the defendant knew that the person had not attained the age of 18 years."). This Court interpreted that earlier version of subsection (c) as meaning that, when "the defendant had a reasonable opportunity to observe the victim, [the government] need prove only that he

recklessly disregarded the fact that she was under the age of eighteen, not that the defendant knew she was." *Mozie*, 752 F.3d at 1282. That is, we read the earlier version of subsection (c) as governing when the government may proceed under a theory of reckless disregard instead of actual knowledge. But that interpretation was dictum because it was "not necessary to deciding the case then before us." *Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019) (citation and internal quotation marks omitted). Because Mozie's victims testified that they told him their ages, we held that the government satisfied its burden of proving that Mozie knew his victims' ages. *See Mozie*, 752 F.3d at 1286.

Our dictum in *Mozie* conflicted with an interpretation of subsection (c) by the Second Circuit. *See Robinson*, 702 F.3d at 31–32. In *Robinson*, the Second Circuit held that proof of a reasonable opportunity to observe the victim is a "substitute for proof that the defendant knew the victim's underage status." *Id.* at 32. And the Second Circuit reasoned that the reference in subsection (c) to what the defendant "knew" referred to the *mens rea* element of subsection (a), which included both actual knowledge and reckless disregard. *See id.* at 31–32.

When Congress amended section 1591 in 2015, it adopted the interpretation by the Second Circuit in *Robinson* by adding reckless disregard to subsection (c). *See* Justice for Victims of Trafficking Act of 2015, Pub. L. 114-22, § 108(a)(3)(B), 129 Stat. 227, 239 (codified at 18 U.S.C. § 1591(c): When "the defendant had a

19

reasonable opportunity to observe the [victim], the Government need not prove

that the defendant knew, *or recklessly disregarded the fact*, that the person had not

attained the age of 18 years." (emphasis added)). With this amendment, Congress

made clear that, when the government proves that the defendant had a reasonable

opportunity to observe the victim, it need not prove either actual knowledge *or*

reckless disregard. So this statutory change would supersede our interpretation in

*Mozie* even if it were not dictum. *See United States v. Zlatogur*, 271 F.3d 1025,

1028 n.1 (11th Cir. 2001). As a result, we join our sister circuits in holding that

section 1591(c) unambiguously creates an independent basis of liability when the

government proves a defendant had a reasonable opportunity to observe the victim.

*See Duong*, 848 F.3d at 931; *Copeland*, 820 F.3d at 813; *Robinson*, 702 F.3d at 31–

32. Proof that a defendant had a "reasonable opportunity to observe" the victim

relieves the government of its burden of proving that the defendant either knew or

recklessly disregarded the victim's age.

Our recent decision in *United States v. Blake*, 868 F.3d 960, 976 (11th Cir.

2017), is not to the contrary. In *Blake*, we explained that, "[u]nder 18 U.S.C.

§ 1591(c), *in order to prove knowledge for purposes of § 1591(a)*, the government

did not need to prove that [the defendant] had actual knowledge that [the victim]

was underage; it needed to prove *only* that [the defendant] had a 'reasonable

opportunity' to observe [the victim]." *Id.* at 976 (emphases added). After

recounting the evidence, we concluded that the defendant had a reasonable

opportunity to observe the victim, "which, under § 1591(c), satisfied § 1591(a)'s

knowledge requirement." *Id.*

Because section 1591 permitted the government to convict Whyte and

Castro by proving that they had a reasonable opportunity to observe A.E., Whyte

and Castro's other arguments based on their mistaken interpretation fail. The

indictment and jury instructions omitted no essential element by including the

element of a reasonable opportunity to observe A.E. instead of knowledge or

reckless disregard of her age. And they were not entitled to a mistake-of-age

defense or an instruction about it because, when the government proceeds on the

theory that a defendant had a reasonable opportunity to observe the victim, his

mistake about the victim's age is no defense. *See United States v. Deverso*, 518

F.3d 1250, 1257 (11th Cir. 2008) (explaining that a defendant has no right to a

mistake-of-age defense or instruction when "knowledge of [the victim's] age is not

an element of [the] offense").

Whyte and Castro alternatively argue that section 1591 impermissibly

imposes strict liability, but we disagree. Section 1591 "does not actually impose

'strict liability' because the statute, throughout its revisions, has retained a

traditional scienter requirement" of knowledge that the victim "will be caused to

engage in a commercial sex act." *Copeland*, 820 F.3d at 812 n.6 (quoting 18

U.S.C. § 1591(a)). Our interpretation "concerns only scienter as to the victim's age, which is distinct from the Government's independent burden of proving beyond a reasonable doubt that a defendant was knowingly involved in a commercial sex act." *Id.* As Whyte acknowledges, Congress may dislodge the presumption that an element requires proof of a culpable mental state, *see Bond v. United States*, 572 U.S. 844, 857 (2014), and in section 1591(c), Congress clearly "impose[d] strict liability with regard to the defendant's awareness of the victim's age," *Robinson*, 702 F.3d at 26; *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n.2 (1994) (highlighting that, when "the perpetrator confronts the underage victim personally," he "may reasonably be required to ascertain the victim's age"). And many federal statutes that protect children "use nearly identical language and . . . have been interpreted to 'lack *mens rea* requirements with respect to the victim's age.'" *Robinson*, 702 F.3d at 33 (alterations adopted) (quoting *United States v. Jennings*, 496 F.3d 344, 353 (4th Cir. 2007)) (collecting statutes and cases that construe them "as disclaiming *mens rea* requirements with respect to the victim's age"). The district court correctly interpreted section 1591 as permitting the government to prove only that Whyte and Castro had a reasonable opportunity to observe A.E.

Castro argues that the "undefined and elusive concept" of a "reasonable opportunity to observe" is unconstitutionally vague, but our precedent forecloses

this argument. The Supreme Court has ruled that a statute must afford "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (citation and internal quotation marks omitted). We have held that the standard "reasonable opportunity to observe" is not unconstitutionally vague. *See Mozie*, 752 F.3d at 1282. As we explained, the argument "that an ordinary person would not understand what qualifies as . . . a 'reasonable opportunity to observe' runs counter to centuries of jurisprudence; those terms are familiar legal concepts that have played an integral role in defining proscribed conduct over the years." *Id.* at 1283. Although the 2015 amendments to section 1591 abrogated our interpretation of the interplay between subsections (a) and (c) in *Mozie*, the "reasonable opportunity to observe" standard has not changed, so our holding in *Mozie* rejecting a vagueness challenge to it remains binding precedent. *See United States v. Duncan*, 400 F.3d 1297, 1305 (11th Cir. 2005) (explaining that the unaffected holdings of a partially abrogated decision remain binding under the prior-panel-precedent rule).

Castro's argument about vagueness also fails as applied to the facts of her case. We have held that "five or six interactions," including the "considerable interaction" of a 20-minute erotic photo session, provided a defendant with a reasonable opportunity to observe the victim. *See Blake*, 868 F.3d at 976. Far exceeding the five or six interactions that we held were sufficient in *Blake*, Castro

had many opportunities to observe A.E. during the nearly two months when A.E. lived with Whyte and Castro. During this time, they ate meals, watched television, and went shopping together. Castro responds that A.E. never told her that she was under 18 and engaged in many adult activities, including smoking marijuana, spending the night with men, and not "answering to any parental figures." But that A.E. never told Castro her age does not inform the reasonableness of Castro's opportunities to observe A.E. Castro had opportunities to observe A.E. on an intimate level for long periods. Because Castro clearly had a "reasonable opportunity to observe" A.E., her vagueness challenge to section 1591(c) fails.

## B. *The Jury Instructions About a Commercial Sex Act and Willfulness Were Not Plainly Erroneous.*

Castro argues that the jury instructions failed to explain the element of willfulness for her conspiracy charge and omitted an element for her sex trafficking charge. Because she did not raise these objections at trial, we review for plain error. *See Felts*, 579 F.3d at 1343–44. To establish plain error, a defendant must prove "(1) error, (2) that is plain, and (3) that affects substantial rights," and even then, we may "exercise [our] discretion to notice [the] forfeited error . . . only if [it] seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Shelton*, 400 F.3d 1325, 1329 (11th Cir. 2005) (citation and internal quotation marks omitted). When we "review[] a jury instruction under the plain error standard, we will reverse only in exceptional

24

cases," which ordinarily requires a defendant "to establish that the challenged instruction was an incorrect statement of the law and that it was probably responsible for an incorrect verdict, leading to substantial injustice." *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999) (citations and internal quotation marks omitted). Castro cannot establish plain error for either instruction.

The district court instructed the jury that the second element of a conspiracy is "[t]hat the Defendant knew the unlawful purpose of the plan and willfully joined in it." It also defined the term "willfully" as "mean[ing] that the act was committed voluntarily and purposely with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law." And it explained that "[w]hile a person must have acted with the intent to do something the law forbids before you can find that the person acted willfully, the person need not be aware of the specific law or rule that his or her conduct may be violating." These instructions mirror our pattern jury instructions, *see* 11th Cir. Pattern Jury Instr. (Crim.) B9.1A (2016), and the Supreme Court's explanation of willfulness, *see Bryan v. United States*, 524 U.S. 184, 191–95 (1998).

Castro argues that the instruction should have included knowledge of the victim's age as an element of the conspiracy because she could not willfully agree to commit sex trafficking of a minor if she did not know A.E. was a minor, but we disagree. The Supreme Court has rejected a similar argument that

25

a charge of "conspiracy to commit assault on a federal officer" requires

knowledge that the victim was a federal officer. *See United States v. Feola*, 420

U.S. 671, 696 (1965). In *Feola*, the Supreme Court explained that, because the

substantive offense does not require knowledge of the victim's status as a

federal agent, a "greater scienter requirement can[not] be engrafted upon the

conspiracy offense, which is merely an agreement to commit [that] act." *Id.* at

676; *see also id.* at 686, 696. Like *Feola*, Castro's offense of sex trafficking of a

minor does not require knowledge of the victim's status as a minor, so she

cannot import such a requirement into her conspiracy offense. *See also United*

*States v. Duran*, 596 F.3d 1283, 1296 (11th Cir. 2010) (acknowledging "the

longstanding and uniformly recognized rule" that a conspiracy charge "does not

impose its scienter requirement upon the [substantive] offense that is the object

of the conspiracy").

Castro also argues that the instruction for sex trafficking of a minor omitted

the element of a "commercial sex act." A district court must "instruct the jury on

*all* the essential elements of the crime charged," including identifying those

essential elements as such. *United States v. Herzog*, 632 F.2d 469, 472 (5th Cir.

1980) (emphasis added). The district court failed to identify the essential element

of knowledge or reckless disregard that A.E. would be caused to commit a

commercial sex act in its numbered list of facts for the jury to find. But "[t]he

failure to instruct the jury on an essential element of the offense charged does not always amount to reversible 'plain error.'" *Id.* We must consider "the totality of the charge as a whole" and determine "whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error." *United States v. Duncan*, 855 F.2d 1528, 1532 (11th Cir. 1988) (citation and internal quotation marks omitted).

In the light of the entirety of the instructions given, the omission of the element of a commercial sex-act from the numbered list did not constitute plain error. Immediately before the numbered list of elements, the instruction for the sex-trafficking count included that "[i]t is a federal crime for anyone . . . to recruit, entice, harbor, transport, provide, obtain or maintain by any means, a person, knowing or in reckless disregard of the fact that the person . . . *would be caused to engage in a commercial sex act*." A definition of a "commercial sex act" followed the numbered list. And the instruction for the conspiracy count included the element in its numbered list of facts that the jury must find. Taken as a whole, the instructions addressed the element of knowledge that A.E. would be caused to engage in a commercial sex act. And the district court provided the jury with a copy of the indictment—which included knowledge that A.E. would be caused to engage in a commercial sex act as an element of the sex trafficking of a minor

charge—during deliberations. *See United States v. Slaughter*, 238 F.3d 580, 583–84 (5th Cir. 2000) (holding that a jury instruction that omitted an element did not constitute plain error when "the jury had the counts of the indictments in the jury room during deliberations"). So any potential harm caused by failing to include the element in the numbered list was cured by providing the other instructions and the indictment to the jury.

### C. The District Court Did Not Err in Denying the Motion to Suppress.

Whyte and Castro argue that the district court erred when it denied their motion to suppress because Detective Masters's affidavit supporting the search warrant omitted A.E.'s criminal history. An affidavit supporting a search warrant is presumed valid. *Franks*, 438 U.S. at 171. To obtain suppression of evidence discovered pursuant to a warrant, a defendant must overcome that presumption by proving that the affiant made misrepresentations or omissions deliberately or with a reckless disregard for the truth and that the affiant's misrepresentations or omissions materially affected the probable-cause determination. *See id.* at 171–72; *see also United States v. Novaton*, 271 F.3d 968, 986–87 (11th Cir. 2001) (applying the *Franks* standard to omissions). Omissions made negligently or because of an innocent mistake are insufficient to warrant suppression of the evidence. *See Franks*, 438 U.S. at 171–72.

Whyte and Castro are not entitled to suppression because they failed to argue that the affiant, Detective Masters, omitted material facts deliberately or with a reckless disregard for the truth. Besides a barebones assertion that "law enforcement intentionally, or at least recklessly, omitted numerous material facts," Whyte and Castro provided no argument in their opening briefs that Detective Masters acted deliberately or with a reckless disregard when he omitted A.E.'s criminal history from his affidavit, so they have abandoned this contention. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). Without an argument that Detective Masters acted deliberately or with a reckless disregard, Whyte and Castro had no right to suppression under *Franks*. *See United States v. Haimowitz*, 706 F.2d 1549, 1556 (11th Cir. 1983) (rejecting a *Franks* challenge when a defendant made only "conclusory allegations, unsupported by an offer of proof").

In her reply brief, Castro suggests that she argued Detective Masters acted deliberately because he knew A.E.'s criminal history and did not include that information since it did not seem relevant. But Castro misunderstands what she had to prove. For an affirmative misrepresentation in an affidavit, deliberateness refers to a "deliberate falsehood"—not any action done intentionally. *See Franks*, 438

U.S. at 171. So for an omission, deliberateness must also refer to something akin to bad faith on the part of the affiant—not merely that the affiant knew some information and did not include it. *Cf. id.*; *see also Novaton*, 271 F.3d at 988 (finding no deliberateness or reckless disregard when an officer knew an informant's criminal history but omitted it from his affidavit). In other words, the omission must have been made with the purpose of misleading the judge issuing the warrant. Detective Masters's awareness of A.E.'s criminal history and decision not to include it in his affidavit is not enough to prove he acted "deliberately" for a *Franks* violation. Whyte and Castro failed to argue that Detective Masters deliberately omitted A.E.'s criminal history to mislead the judge.

### D. The Limitation on Castro's Cross-Examination of A.E. Did Not Violate Castro's Right of Confrontation.

The Sixth Amendment affords a criminal defendant a right to confront witnesses against him that includes the right of cross-examination, but "the defendant's right to cross-examine witnesses is not without limitation." *Jeri*, 869 F.3d at 1262 (alteration adopted) (citations and internal quotation marks omitted). A defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (citation and internal quotation marks omitted). So a "district court retains 'wide latitude' to 'impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice,

confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (alteration adopted) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). To decide whether a limitation on cross-examination violated the Confrontation Clause, we consider "whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *United States v. Diaz*, 26 F.3d 1533, 1539–40 (11th Cir. 1994) (citation and internal quotation marks omitted).

Castro argues that she should have been able to cross-examine A.E. about whether she lied in her probation hearing to avoid imprisonment. On direct examination, A.E. testified that she traveled from California to Florida at the behest of Marcus Weber and that she had been found not in violation of her probation for leaving California. Castro sought to cross-examine A.E. about whether her statement at the hearing that she left California involuntarily was a lie. According to Castro, this testimony would have impeached A.E.'s credibility by establishing that A.E. cooperated with the government only to avoid a lengthy prison sentence for violating her probation. The district court prevented this line of cross-examination based on relevance.

Although the district court barred Castro from specifically asking A.E. whether she lied about how she got to Florida to avoid a probation violation, this

lone limitation did not deny Castro "an opportunity for effective cross-examination," which is all that the Sixth Amendment guarantees. *See Jeri*, 869 F.3d at 1262 (citation and internal quotation marks omitted). Whether A.E. lied that she left California involuntarily bears on her credibility, but "the mere fact that [Castro] sought to explore bias on the part of a prosecution witness does not automatically void the court's ability to limit cross-examination." *Diaz*, 26 F.3d at 1540. Castro explored A.E.'s bias and credibility during the nearly two-day cross-examination of A.E. Castro elicited testimony from A.E. admitting to the jury that she had "lied plenty of times in the past" to police officers and others. Notably, the district court later permitted Castro to cross-examine A.E. about her motivation for cooperating with the government. Castro cross-examined A.E. about the possible "15-year prison sentence hanging over [her] head." And Castro asked A.E., "Isn't it true that the only reason you're here testifying is so that you don't get violated on your probation?" So the testimony that Castro sought to elicit about A.E.'s motivation for cooperating with the government would have been cumulative. No "reasonable jury would have received a significantly different impression of [A.E.'s] credibility had" Castro pursued the specific line of questioning about whether A.E. lied about how she got to Florida in her probation hearing to avoid imprisonment. *Id.* at 1539–40 (citation and internal quotation marks omitted).

E. *The District Court Did Not Err when It Sentenced Whyte and Castro.*

Whyte and Castro raise two challenges to their sentences. First, they argue that the district court erroneously applied three enhancements and declined to apply a reduction in calculating their guideline ranges. Second, they argue that the district court imposed substantively unreasonable sentences. Both arguments fail.

1. The District Court Did Not Err when It Applied Three Enhancements and Declined to Apply a Reduction.

Whyte argues that he should have received a two-point reduction for acceptance of responsibility. To receive that reduction, a defendant must "clearly demonstrate[] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "The reduction may be available, in a rare case, even when the defendant proceeds to trial," *United States v. Spoerke*, 568 F.3d 1236, 1251 (11th Cir. 2009), such as when a defendant "assert[s] and preserve[s] issues that do not relate to factual guilt," U.S.S.G. § 3E1.1(a) cmt. n.2. But the reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1(a) cmt. n.2. For example, the reduction did not apply when, "in addition to his challenge to the constitutionality of the Firearms Act," a defendant challenged whether "pipe bombs were destructive devices" prohibited by the Act. *Spoerke*, 568 F.3d at 1252.

Whyte is not entitled to a reduction for acceptance of responsibility because he contested a factual element of guilt by arguing that he never had a "reasonable opportunity to observe" A.E. Whether a defendant had a "reasonable opportunity to observe" the victim depends on the facts of that particular defendant's interactions with that victim. By arguing that he had no reasonable opportunity to observe A.E. because she looked and acted like an adult, Whyte put the government to its burden of proof at trial on this issue. That is, Whyte never accepted responsibility for his conduct; to the contrary, he always contested that he was not responsible for sex trafficking of a minor because a reasonable person would observe A.E. and conclude that she was over 18. So the district court did not err when it denied an acceptance-of-responsibility reduction.

Whyte next argues that the district court erred when it applied an undue-influence enhancement. The undue-influence enhancement applies to "a participant [who] otherwise unduly influenced a minor to engage in prohibited sexual conduct." U.S.S.G. § 2G1.3(b)(2)(B). We "closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." *Id.* § 2G1.3 cmt. n.3(b). Because Whyte is ten years older than A.E., we apply a rebuttable presumption that he unduly influenced A.E. *Id.* To decide whether he rebuts this presumption, we "may consider whether his conduct displayed an abuse of superior knowledge, influence

and resources." *Blake*, 868 F.3d at 977 (alteration adopted) (citation and internal quotation marks omitted). A defendant abuses his superior knowledge and resources by managing his victim's prostitution through actions like advertising her services, driving her to engagements, and handling the money. *See id*. Because undue influence is a factual finding, we review for clear error. *See id*.

Whyte failed to rebut the presumption that he unduly influenced A.E. because he abused his superior knowledge, influence, and resources to facilitate her prostitution. Whyte managed A.E.'s prostitution by posting Backpage.com ads and communicating with her clients on the trick phone. And Whyte used his resources to facilitate A.E.'s engagements. Whyte obtained a false identity for A.E. so that she could work at strip clubs, where he also instructed her to pick up clients. Whyte drove A.E. to her engagements and collected her money when she was done. And Whyte exerted influence over A.E.; when A.E. ran away, Whyte persuaded A.E. to return by playing on her emotions, calling them a "family."

Whyte contends that the undue-influence enhancement could not apply because A.E. had already worked as an escort when she met him, but we disagree. That a minor has engaged in previous acts of prostitution does not foreclose that a defendant may have unduly influenced her to engage in further acts of prostitution. The district court did not clearly err when it found that Whyte unduly influenced A.E. to engage in further acts of prohibited sexual conduct.

Whyte and Castro argue that the district court erred when it applied an enhancement for the use of a computer based on their use of smart-phones to communicate with A.E.'s clients. Because Whyte did not object to this enhancement, we review his claim for plain error. *Felts*, 579 F.3d at 1343. Section 2G1.3(b)(3)(B) provides a two-level enhancement when "the offense involved the use of a computer" to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor." U.S.S.G. § 2G1.3(b)(3)(B). The parties agree that a smart-phone qualifies as a computer.

Castro contends that, based on application note 4, the enhancement should not apply because she did not use a computer to communicate directly with A.E. or a person exercising custody or control over A.E., but her reliance on application note 4 is misplaced. Application note 4 provides that the enhancement "is intended to apply only to the use of a computer or an interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor." *Id.* § 2G1.3 cmt. n.4.

This Court has held that application note 4 is not authoritative for an enhancement under section 2G1.3(b)(3)(B) of the Guidelines because it is "a plainly erroneous reading of th[e] guideline." *Hill*, 783 F.3d at 844–45. We explained that the application note purports to exclude conduct that clearly falls within the ambit of the plain language of section 2G1.3(b)(3)(B). For example, in

36

*Hill*, a defendant used a computer "to solicit a person to engage in prohibited sexual conduct with a minor" when he sent explicit photos of minors to a cohort to post in online prostitution ads. *See id.* But the application note would have barred the enhancement because the defendant sent the photos only to a cohort, not to a minor or a person exercising control over the minor. We joined several of our sister circuits in holding "that the application note is patently inconsistent with the guideline." *Id.* at 845; *see also United States v. Cramer*, 777 F.3d 597, 604 (2d Cir. 2015); *United States v. McMillian*, 777 F.3d 444, 450 (7th Cir. 2015); *United States v. Pringler*, 765 F.3d 445, 454–56 (5th Cir. 2014). And we concluded that the application note was a drafting error based on the drafting history of the enhancement. *See Hill*, 783 F.3d at 845–46 (explaining that application note 4 "was only intended to apply to the situation posited in [section 2G1.3(b)(3)(A)]" (citation and internal quotation marks omitted)). We held that "the plain language of the guideline controls" for an enhancement under section 2G1.3(b)(3)(B), and the use of a "cellphone to place online ads offering young girls for prohibited purposes" "fall[s] squarely within the language of the enhancement." *Id.* at 846. After *Hill*, two other circuits have held that application note 4 is inconsistent with the plain language of section 2G1.3(b)(3)(B). *See United States v. Houston*, 857 F.3d 427, 435 (1st Cir. 2017); *United States v. Gibson*, 840 F.3d 512, 514 (8th Cir. 2016). *Hill* disposes of Castro's argument that the enhancement cannot apply

because she did not use a computer to communicate directly with A.E. or a person exercising control over A.E.

Castro urges us to disregard *Hill*. She contends that the Sentencing Commission is presumed to be aware of controlling precedent that affects the Guidelines and, despite *Hill* and the decisions of our sister circuits, application note 4 remains unchanged in the current Guidelines.

Castro's argument fails for two reasons. First, we cannot disregard *Hill* because we are bound by it under the prior-panel-precedent rule. *See United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong."); *see also id.* at 1318 ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." (quoting *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997)). Of course, "a significant change in language is presumed to entail a change in meaning." Scalia & Garner, *Reading Law* § 40, at 256. But we cannot indulge Castro's converse argument that *no* change in the language of application note 4 after *Hill* means that the Sentencing Commission presumed to entail a change in meaning—that is, to contradict *Hill*'s interpretation. Second, the Commission has not ignored this problem. The 2018 amendments to the Guidelines amended application note 4, and after citing the decisions addressing the problem, the

38

Commission explained that application note 4 does not apply to an enhancement under section 2G1.3(b)(3)(B). *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines* 80 (Apr. 30, 2018). So the Sentencing Commission has validated our interpretation in *Hill*.

When we set aside application note 4 as *Hill* requires us to do, it is clear that Whyte and Castro used a computer to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct" with A.E. U.S.S.G. § 2G1.3(b)(3)(B). Both Whyte and Castro used a computer to solicit clients for A.E. when they posted Backpage.com ads for A.E.'s prostitution, which this Court has explained falls squarely within the enhancement. *Hill*, 783 F.3d at 846 (holding that posting online ads for the prostitution of a minor qualifies for the enhancement). The district court did not err by applying the use-of-computer enhancement to Whyte and Castro.

Castro argues that her enhancement for the commission of a sex act amounts to double counting, but precedent forecloses this argument. "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *Blake*, 868 F.3d at 977 (quoting *United States v. Matos-Rodriquez*, 188 F.3d 1300, 1309 (11th Cir. 1999)). According to Castro, section 1591 punishes the commission of a sex act, which factors into her base offense level, U.S.S.G. § 2G1.3(a), so the enhancement

for the commission of a sex act punishes her twice for the same harm, *id.*

§ 2G1.3(b)(4)(A). This Court has held that applying the sex-act enhancement along

with the base offense level for a section 1591 offense does "not amount to

impermissible double counting" because they "punish different harms." *Blake*, 868

F.3d at 977–78. In *Blake*, we explained that the sex-act enhancement "reaches only

offenses where a sex act or sexual conduct actually did occur," but the substantive

offense of section 1591 requires only that the defendant "put the victim in a

position where a sex act *could* occur, regardless of whether a sex act eventually *did*

occur." *Id.* at 977. So no double counting occurred when the district court applied

the sex-act enhancement to Castro.

### 2.  The District Court Did Not Impose Substantively Unreasonable Sentences.

When a defendant challenges his sentence as substantively unreasonable, we

review the steps that the district court took in making its sentencing decision

"through the prism of abuse of discretion." *Irey*, 612 F.3d at 1190 (citation and

internal quotation marks omitted). To vacate a sentence for substantive

unreasonableness, we must be "left with the definite and firm conviction that the

district court committed a clear error of judgment in weighing the § 3553(a) factors

by arriving at a sentence that lies outside the range of reasonable sentences dictated

by the facts of the case." *Id.* (citation and internal quotation marks omitted). "A

district court's sentence need not be the most appropriate one, it need only be a

reasonable one." *Id.* at 1191. We ordinarily expect that a sentence within the Guidelines is reasonable. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

The district court did not abuse its discretion when it sentenced Whyte to 300 months of imprisonment. It conducted a thorough analysis of the statutory sentencing factors and weighed them reasonably. The court considered the circumstances of the offense, 18 U.S.C. § 3553(a)(1), when it accounted for the absence of proof that Whyte knew A.E. was a minor. It also considered Whyte's characteristics, including his criminal history, *id.* Indeed, the court treated Whyte as if he belonged in a lower criminal-history category after deciding that his criminal-history category of VI overrepresented his criminal history. This ruling led the district court to calculate a lower guideline range for Whyte. And the court accounted for Whyte's family support. The court then considered whether unwarranted sentence disparities would result, *id.* § 3553(a)(6), but found none because similar defendants had received life in prison for similar conduct. The court also highlighted that it was important to impose a sentence that would act as a deterrent and promote respect for the law, *id.* § 3553(a)(2). After "weigh[ing] the aggravating and mitigating circumstances," the court concluded "that a sentence near the low end of the guideline range [was] appropriate." Whyte's sentence of

300 months is near the bottom of his guideline range of 292 to 365 months with his adjusted criminal-history category.

The district court did not abuse its discretion when it sentenced Castro to 188 months of imprisonment. It again reasonably weighed the relevant sentencing factors. The district court took into account that the government did not prove that Castro knew A.E.'s age as a mitigating circumstance. It considered Castro's history and characteristics when it included the negative effect of her incarceration on her children as a mitigating circumstance. Castro argues that the district court should have also considered her history of physical infirmities, including panic attacks and seizures, but the court did not have to "specifically mention [every] ground[] for variance that [Castro] argued." *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). The district court reasonably concluded that no unwarranted disparity would result because it had sentenced similar defendants in "similar situations [to] way over ten years in prison." It reiterated the importance of imposing a sentence that would act as a deterrent and promote respect for the law. The court "weigh[ed] the aggravating and mitigating circumstances" not to warrant a downward departure or variance but in favor of "a sentence at the low end of the guideline range." That sentence is not substantively unreasonable.

Despite their sentences near the low end of their guideline ranges, Whyte and Castro fault the district court for failing to account for the nature of the specific offense. According to them, their offenses are atypical of sex trafficking of a minor because they did not involve "a young woman being forced against her will to engage in commercial sex acts." They highlight that A.E. had already been a prostitute before they met her, and they merely "befriended" A.E. by inviting her to live with them.

The absence of force or threats is immaterial for their offenses. The government charged Whyte and Castro with sex trafficking of a minor under section 1591(b)(2), which does not require force. Had the government charged them under section 1591(b)(1), which requires force or threats of force, they would have been subject to a higher mandatory minimum sentence and base offense level, *see* U.S.S.G. § 2G1.3(a)(1). Nor does A.E.'s prior prostitution and criminal history make their case atypical. As Detective Masters testified, a victim of sex trafficking often has a criminal history, and a "victim[] with baggage is par for the course" in these cases. *See also Blake*, 868 F.3d at 978 (affirming 324-month sentence for defendant who prostituted an underage girl who had sought to prostitute herself). The district court imposed reasonable sentences.

## IV. CONCLUSION

We **AFFIRM** the convictions and sentences of Whyte and Castro.

43